UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIC WILLIAMS,

      Plaintiff,

                                      Case No. 1:21-cv-1011

v.

                                        Hon. Hala Y. Jarbou

CITY OF GRAND RAPIDS, et al.,

      Defendants.

_____/

## OPINION

Plaintiff Dominic Williams brings this civil rights action asserting claims under 42 U.S.C. § 1983. Williams alleges that Defendants Ryan Johnston and Makentorch Seide violated his Fourth Amendment rights to be free from excessive force, unreasonable search and seizure, and arrest without probable cause. Williams also brings a municipal liability claim against Defendant the City of Grand Rapids. Finally, Williams asserts state law claims of assault and battery, false arrest and false imprisonment, and gross negligence against the individual officers. Before the Court is Defendants' motion for summary judgment or, in the alternative, for judgment on the pleadings (ECF No. 37). For the reasons stated below, the Court will grant in part and deny in part the motion.

## I. FACTUAL BACKGROUND

At approximately 11:30 p.m. on March 2, 2020, Williams—who was driving his wife's car—stopped at a BP gas station in Grand Rapids. (Police Rep., ECF No. 38-1, PageID.143.) While monitoring the gas station parking lot, which is in a high-crime area, officer Johnston ran a license plate check on the car. (*Id.*, Johnston Dep. 27-28, ECF No. 38-2.) The plate check revealed that Williams's wife, the registered owner of the vehicle, had an outstanding arrest warrant. (Police

Rep., PageID.143.)  When exiting the gas station, Williams failed to use a turn signal.  (*Id.*)  Johnston followed behind the vehicle and initiated a traffic stop.  (*Id.*)

Johnston approached the vehicle and repeatedly asked Williams to roll his window down.  (Johnston Body Camera Video 1:04-1:34, ECF No. 44-5.)  Williams refused to roll his window down all the way and said that he feared for his life.  (*Id.* at 1:37-1:42.)  During this time, Williams was also talking to his wife on the phone.  Johnston asked him to hang up the phone and, again, to roll his window down, and Williams replied, "hold on, man."  (*Id.* at 1:43-1:59.)  Williams then stated that he wanted to record the interaction for his safety, and Johnston said that he was likewise recording.  (*Id.* at 1:59-2:05.)

Johnston asked Williams for his license (*Id.* at 2:46-2:48.)  Johnston then explained that he stopped Williams because he failed to use a turn signal when pulling out of the gas station and because there was an outstanding arrest warrant for the owner of the vehicle.  (*Id.* at 2:57-3:10.)  Williams handed Johnston the vehicle's registration through a crack in the window but indicated that he only had a photo of his license on his cell phone.  (*Id.* at 3:11-3:33.)  Johnston informed Williams that driving without a license on your person is a misdemeanor and asked Williams to step out of the vehicle.  (*Id.* at 3:33-3:42.)  While Johnston spoke with Williams, Officer Seide arrived on the scene and stood next to Johnston.  (Seide Body Camera Video 1:38-1:51, ECF No. 44-7.)

Johnston then opened the driver's side door, and Williams stepped out of the vehicle while Johnston had a hand on his shoulder.  (*Id.* at 1:52-2:01; Johnston Body Camera Video 3:55-4:06.)  Williams contends that he was pulled from the vehicle.  (Williams Dep. 27, ECF No. 38-9.)  Johnston informed Williams that he was under arrest and instructed Williams to put his hands behind his back and to put his left hand behind his head.  (Johnston Body Camera Video 4:03-

4:18.)  Johnston, who had control of one of Williams's hands, then attempted to handcuff him. (Johnston Dep. 54-56.)

Johnston and Seide testified that while Johnston attempted to secure the handcuffs, Williams dropped his weight and deliberately leaned into the vehicle.  (*Id.* at 55-56; Seide Dep. 28, ECF No. 38-6.)  Williams testified that he fell into the vehicle because of the way his body was positioned.  (Williams Dep. 29-30.)  Officer Clark's body camera—which provides a view from the passenger's side of the vehicle—depicts Williams bent over inside the car.  (Clark Body Camera Video 2:30-2:35, ECF No. 44-6.)

Johnston then used a "straight arm-bar" maneuver to bring Williams to the ground. (Johnston Dep. 58.)  Johnston testified that he dropped his knee so that it broke Williams's fall. (*Id.* at 59.)  Williams could not recall what side he fell on but testified that his whole body hit the ground.  (Williams Dep. 40-41.)

Once on the ground, Williams felt a knee or multiple knees on his back.  (Williams Dep. 86.)  Johnston and Seide testified that they do not recall putting a knee to Williams's back. (Johnston Dep. 60; Seide Dep. 30.)  Johnston's dash camera video depicts both Johnston and Seide placing a knee on Williams's back for approximately ten seconds while securing the handcuffs. (Johnston Dash Camera Video 5:28-5:39.)  It also depicts Seide immediately stepping away once the handcuffs were applied, and Johnston remaining on the ground next to Williams.  (*Id.* at 5:40-5:45.)  Williams testified that after the handcuffs were secured, an officer "still had his knee on [him] for a little minute . . . possibly a couple seconds."  (Williams Dep. 88.)

Once Johnston and Seide secured the handcuffs, Johnston ensured that there was proper spacing between the handcuff and Williams's wrists.  (Johnston Dep. 62; Johnston Body Camera Video 5:11-5:40.)  Johnston then performed a search of Williams incident to arrest and placed

Williams in the back seat of his patrol car.  (Johnston Dep. 61; Johnston Body Camera Video 5:45-7:14.)  Johnston asked if Williams needed any medical attention, and Williams responded that his knee hurt but that he did not need medical attention.  (Johnston Body Camera Video 7:15-7:22.)

Per Grand Rapids Police Department ("GRPD") policy, Sergeant Hoornstra responded to the use of force incident and arrived on the scene soon after to photograph Williams's injuries and interview him.  (Hoornstra Dep. 9-10, ECF No. 38-8; *see also* On-Scene Injury Images, ECF No. 38-10.)   Before transporting Williams to jail, Johnston retrieved Williams's personal belongings—including his cell phone—from his vehicle before it would be towed.  (Johnston Dep. 64.)  Johnston's body camera footage depicts him swiping up on the screen, which he contends he did to stop the video recording.  (*Id.* at 65; Johnston Body Camera Video 29:13- 29:25.)  Once in his patrol car with Williams, Williams asked him to retrieve his house key from the vehicle and Johnston said, "I've got your phone for you man."  (Johnston Body Camera Video 34:14-34:39.)

While Williams was secure in the patrol car, Johnston learned that Williams's license was also suspended.   (*Id.* at 21:37-22:15.)   Johnston ultimately ticketed Williams for two misdemeanors: (1) driving with a suspended license in violation of Mich. Comp. Laws § 257.904 and (2) assaulting, battering, or resisting a police officer in violation of Grand Rapids City Ordinance § 9.135.  (Ticket, ECF 42-4, PageID.798.)

Once at the jail, Williams complained to the nurse of pain in both wrists but did not complain about his knee, shin, or other injuries and did not request further medical attention. (Williams Dep. 44-45.)  During a series of visits to various hospitals as well as his primary care physician, Williams received diagnoses of tenderness and pain in his right knee, right wrist, right elbow, and shoulders; right carpal tunnel syndrome; lateral epicondylitis (tennis elbow) of the right elbow; and post-concussion syndrome.  (*See* Butterworth Hosp. Med. Recs., ECF No. 44-9;

Southwest Med. Ctr. Med. Recs., ECF No. 44-10; Metro Health Hosp. Med. Recs., ECF No. 44-11; Thornapple Valley Orthopedics Med. Recs., ECF No. 44-12.)  Williams also sought mental health treatment for hallucinations, mood swings, and depressive symptoms.  (*See* Arbor Circle Med. Recs., ECF No. 44-13.)

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.*  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### B. Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).  A motion for judgment on the pleadings is subject to the same review standard as a motion to dismiss under Rule 12(b)(6).  *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012).

To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Merely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient to constitute a plausible claim."  *HDC*, 675 F.3d at 611.  Additionally, the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'"  *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56.  *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### C. Qualified Immunity

"Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights."  *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)).  Officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *Id.*  This legal principle must "clearly prohibit the officer's conduct in

6

the particular circumstances before him." *Id.* at 590.  Accordingly, "[t]he relevant, dispositive inquiry" under the clearly established prong is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

"[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  The plaintiff bears the burden of showing that an officer is not entitled to qualified immunity.  *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016).

"When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately.  [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).

### III. ANALYSIS

#### A. Excessive Force

"A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force." *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022)).  "In deciding whether the force used was excessive, [the Court] balance[s] the government's interests in protecting others (including the police) and curbing crime against a suspect's right [] not to be injured." *Id.* (citing *Gambrel*, 25 F.4th at 400).

When analyzing an excessive force claim,

[t]hree factors are particularly relevant: (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether he [wa]s actively resisting arrest or attempting to evade arrest by flight.

*Id.* (internal citations and quotation marks omitted); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989).  "These factors are not an exhaustive list because the ultimate question is whether the totality of the circumstances justifies [the] particular sort of seizure that took place."  *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022) (internal citations omitted).  "An officer's use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' given the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Id.* (quoting *Graham*, 490 U.S. at 396-97).

### 1. Straight Arm-Bar Takedown

#### (a) Merits

Williams alleges that Johnston used excessive force when he employed a straight arm-bar takedown.  The severity of the crime suggests that the takedown was excessive.  Johnston initiated this traffic stop because Williams failed to use a turn signal.  Johnston also knew that Williams's wife, the owner of the vehicle, had an outstanding warrant for her arrest.  However, after initiating the traffic stop, Johnston realized that Williams's wife was not inside the vehicle.  Johnston ultimately arrested Williams for the misdemeanor offenses of driving without a license on his person in violation of Michigan law and assaulting, battering, or resisting a police officer in violation of Grand Rapids City Ordinance.

Next, in the context of this case, the most important factor is whether Williams actively resisted arrest prior to the takedown.  "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot."  *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015).  "Active resistance has been found where 'some outward manifestation—either verbal or physical—on the part of the suspect

had suggested volitional and conscious defiance.'" *Shumate v. City of Adrian*, 44 F.4th 427, 446 (6th Cir. 2022) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). It includes "physically struggling with, threatening, or disobeying officers" and "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff*, 791 F.3d at 641 (internal citations and quotation marks omitted). However, "'[i]f there is a common thread to be found in [Sixth Circuit] caselaw on this issue, it is that noncompliance alone does not indicate active resistance.'" *Shumate*, 44 F.4th at 446 (quoting *Eldridge*, 533 F. App'x at 535).

Williams did not actively resist arrest by failing to comply with Johnston's verbal orders while in his vehicle. Johnston repeatedly ordered Williams to roll his window down all the way and to stop talking on his cell phone. The Sixth Circuit has "long distinguished active resistance by arrestees from passive resistance" where "[t]he latter is generally shown by the lack of physical resistance or verbal antagonism." *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (internal citations omitted). Although Williams disobeyed verbal orders, his noncompliance was not coupled with physical or verbal hostility. *Cf. Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 96-97 (6th Cir. 2012) (finding active resistance where arrestee verbally threatened to fight the police and suggested that he had a gun he would use to kill himself). Accordingly, Williams's noncompliance with Johnston's verbal orders amounts to passive, not active, resistance.

However, there is a genuine dispute of material fact as to whether Williams actively resisted arrest by dropping his weight into the vehicle. A "deliberate act of defiance using one's own body" crosses the line to active resistance. *Eldridge*, 533 F. App'x at 535. Johnston testified that Williams "made a deliberate attempt to enter the vehicle towards the floorboard area" by "dropp[ing] his body weight." (Johnston Dep. 55-56.) During this time, Johnston only had control

over Williams's right hand, meaning his left hand was free to reach inside the vehicle.  (*Id.*)  However, Williams testified that he fell into the vehicle because of the way his body was positioned.  (Williams Dep. 29-30.)  The body camera footage depicts Williams bent over inside the car, but fails to show exactly how he got there.  (Clark Body Camera Video 2:30-2:35.)  If Williams dropped his body weight into the vehicle, then he actively resisted arrest by deliberately defying Johnston's attempts to handcuff and detain him.  If, however, Williams fell into the vehicle, then he cannot be said to have actively resisted arrest.

Finally, it is not clear whether Williams posed an immediate threat to Johnston or Seide's safety.  There is no evidence of Williams visibly brandishing a weapon or making violent verbal threats.  However, "the record [does] indicate[] that the officers did not have an opportunity to search [Williams] or his vehicle prior to employing the straight-arm bar takedown technique." *Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (citing *Meirthew v. Amore*, 417 F. App'x 494, 497 (6th Cir. 2011)).  Accordingly, if Williams did deliberately attempt to access the driver's-side compartment, then Johnston could have reasonably thought that Williams intended to gain access to a weapon inside the vehicle.  Indeed, Seide—who stood near Johnston watching—testified that when Williams bent over towards the car, Williams "could [have] got in the car, hurt [him] or something or went for a weapon or anything could of happened had he got back inside the vehicle."  (Seide Dep. 38.)  In that case, Williams would have posed a threat to the officers' safety.

"The overarching determination [this Court] make[s] is whether the totality of the circumstances justified the degree of force an officer used."  *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 456 (6th Cir. 2019) (internal citation and quotation marks omitted).  Here, there is a genuine

dispute of material fact as to whether the totality of the circumstances justified Johnston's use of a straight-arm bar takedown.

### (b) Qualified Immunity

However, Johnston is entitled to qualified immunity because Williams's rights were not clearly established.  To defeat a claim of qualified immunity, a plaintiff must show that the right violated "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).  "[T]he law says that when someone resists arrest, the police may constitutionally use force to ensure their compliance." *Rudlaff*, 791 F.3d at 644.  However, "when a suspect does not resist, or has stopped resisting, they cannot."  *Id.* at 642.  This case falls somewhere "in the 'hazy border between excessive and acceptable force.'"  *Id.* at 644 (quoting *Saucier*, 533 U.S. at 206) (citing *Maciariello v. Sumner*, 973 F.3d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.")).  "When in such a haze . . . the proper course is to grant summary judgment to the officers[.]"  *Id.* (internal citations omitted).

In a similar case, *Stanfield v. City of Lima*, 727 F. App'x 841 (6th Cir. 2018), the officers argued that when they had the plaintiff's hand behind his back, his movements (i.e. leaning forward, attempting to raise his right arm, and twisting his body to the left) constituted active resistance.  *Id.* at 844.  The plaintiff—who was intoxicated—argued that he lost his balance while the officers were putting his hands behind his back.  *Id.*  The Sixth Circuit found that the defendant officers violated the plaintiff's constitutional rights by physically taking him to the ground *but* nonetheless granted the officers qualified immunity because the plaintiff's rights were not clearly established where the officers perceived some resistance.  *Id.* at 850.  Indeed, the plaintiff himself recognized that his intoxication and lack of balance "resulted in the movements the officers perceived as resistance."  *Id.* at 844.

Similarly, here, Johnston argues that Williams deliberately dropped his weight in an attempt to enter the vehicle.  Williams argues that he lost his balance and fell into the vehicle but was not trying to deliberately reach into the vehicle.  However, Williams recognizes that Johnston "probably presumed that [he] was trying to reach."  (Williams Dep. 67.)  Because Williams's actions could reasonably have been perceived as resistance by an officer, Johnston is entitled to qualified immunity.

### 2. Knees on Williams's Back

Williams argues that Johnston and Seide put their knees on his back while he was on the ground.  The Sixth Circuit has held that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position *after* being subdued and/or incapacitated constitutes excessive force."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004); *see also Judd v. City of Baxter*, 780 F. App'x 345, 348-49 (6th Cir. 2019) ("We have held repeatedly that an officer cannot place his knee on the back of a prone, unresisting suspect.").  The Sixth Circuit in *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013) declined to interpret *Champion* narrowly, and instead explained:

> *Champion* proscribes the use of "substantial or significant pressure" that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others.  That Champion himself was handcuffed when this occurred is incidental to the rule.

*Martin*, 712 F.3d at 961.

Williams testified that while on the ground but prior to being handcuffed, he did not squirm, attempt to hit an officer, or otherwise resist.  (Williams Dep. 87.)  Johnston likewise acknowledges that, while on the ground, Williams did not squirm, attempt to flee, or pull his hands away to prevent the handcuffing.  (Johnston Dep. 60-61.)  Williams testified that, during this time, he felt a knee or multiple knees on his back.  (Williams Dep. at 86.)  Johnston and Seide testified that

they do not recall putting a knee to Williams's back.  (Johnston Dep. 60; Seide Dep. 30.)  However, Johnston's dash camera video depicts both Johnston and Seide placing a knee on Williams's back for approximately ten seconds while securing the handcuffs.  (Johnston Dash Camera Video 5:28-5:39.)  It also depicts Seide immediately stepping away once the handcuffs were applied, and Johnston remaining on the ground next to Williams.  (*Id.* at 5:40-5:45.)  Williams testified that after the handcuffs were secured, an officer "still had his knee on [him] for a little minute . . . possibly a couple seconds."  (Williams Dep. 88.)

Johnston and Seide did not use excessive force when placing their knees on Williams's back prior to and after handcuffing him.  First, *Champion*, *Martin*, and subsequent Sixth Circuit precedent requires that the pressure applied be substantial or significant, not de minimis.  *See, e.g.*, *Judd*, 780 F. App'x at 349 (finding that the defendant used excessive force when jumping on top of the plaintiff while he lay handcuffed on the ground).  Here, Williams testified that "[i]t was a little pressure applied . . . not so serious as to bring pain, but [he] felt it there."  (Williams Dep. 87.)  Moreover, in many of the aforementioned cases, the officers applied substantial or significant pressure for a prolonged period of time, placing the suspect at risk of asphyxiation.  *See e.g.*, *Champion*, 380 F.3d at 897 (considering an excessive force claim brought by the family of a severely autistic man who died after officers held him prone on the ground for approximately seventeen minutes); *Hopper v. Plummer*, 887 F.3d 744, 754 (6th Cir. 2018) (considering an excessive force claim where the officers held the plaintiff handcuffed and prone on the ground while placing knees on either side of his thighs, on his lower legs, in front of his right shoulder, and on his arm for approximately twenty-two minutes before realizing that the plaintiff was no longer breathing).  Here, the officers placed a knee on Williams's back for less than a minute total. There is no evidence that Johnston and Seide applied substantial or significant pressure that created

asphyxiating conditions.  They are entitled to summary judgment on the excessive force claim as it relates to placing their knees on Williams's back.

### 3. Failure to Intervene

Williams argues that Seide should be held liable for failing to intervene and stop Johnston's allegedly excessive uses of force.  "In order to sustain a failure-to-intervene claim for the use of excessive force by another officer, [the plaintiff] must show that '(1) [the officer] observed or had reason to know that excessive force would be or was being used; and (2) [the officer] had both the opportunity and the means to prevent the harm from occurring.'"  *Pelton v. Perdue*, 731 F. App'x 418, 426 (6th Cir. 2018) (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015)); *see also Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

As it relates to Johnston's straight arm-bar takedown, Williams's claim against Seide fails because there is no evidence in the record from which a reasonable juror could conclude that Seide was on notice that Johnston would use this maneuver on Williams.  "Where an act of excessive force unfolds in a matter of seconds, the second requirement [of a failure-to-intervene claim] is generally not satisfied."  *Pennington v. Terry*, 644 F. App'x 533, 548 (6th Cir. 2016) (citing *Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 506 (6th Cir. 2007)).  The Sixth Circuit has reasoned that "it demands too much of officers to require that they intervene within a sudden and quickly-expired moment of opportunity."  *Id.* (citing *Ontha*, 222 F. App'x 506-07).

Williams further alleges that Seide both "put[] his knees in Plaintiff's back" and "obviously also failed to intervene and advise [] Johnston to remove his knees from Plaintiff's back[.]"  (Pl.'s Resp. to Defs.' Mot for Summ. J., ECF No. 42, PageID.580.)  As previously explained, Williams and Seide briefly placing their knees on Williams's back does not amount to excessive force. There can be no failure to intervene absent a use of excessive force.  Moreover, Williams cites no caselaw demonstrating that an officer may be held liable for both actively using excessive force

14

and failing to intervene to stop the same force that he or she was likewise applying.  Seide is entitled to summary judgment on Williams's failure-to-intervene theory of excessive force.

### B. Unreasonable Search and Seizure

The Fourth Amendment provides [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "To determine if a search or seizure was unreasonable, and thus unconstitutional, courts balance the degree of intrusion on the individual's interests against 'the importance of the governmental interests alleged to justify the intrusion.'"  *Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

As an initial matter, the Court will only address whether Johnston unreasonably searched Williams's cell phone.  Williams's complaint alleges that Johnston violated his Fourth Amendment rights "by searching Plaintiff's cell phone and/or seizing same without probable cause, exigent circumstances, or any other legal justification, and then deleting the video taken by Plaintiff of the incident complained of."  (Compl. ¶ 31, ECF No. 1.)  Neither party briefed the issue of whether Johnston seized Williams's phone in violation of his Fourth Amendment rights.  Accordingly, the Court will not address the issue in this opinion; it will only address the alleged search.

### 1. Spoliation of Evidence

Johnston argues that he is entitled to summary judgment on William's unreasonable search claim because Williams failed to preserve his cell phone.  However, Johnston raises this argument in passing in a footnote.  The footnote states, in relevant part, that

> Plaintiff failed to preserve the evidence that the video even existed, let alone that it was deliberately deleted, by failing to preserve his cell phone . . . . Plaintiff has no evidence to support his accusation, largely because Plaintiff failed to preserve the only evidence he could have had – the cell phone itself.

15

(Defs.' Br. in Supp. of Mot. for Summ. J., ECF No. 38, PageID.127.)  The footnote is otherwise entirely devoid of any legal standards, citations, or analysis.  Johnston "forfeited any [spoliation of evidence] argument as to this claim by addressing it only in a footnote at the end of [his] brief." *Henkel of Am., Inc. v. Bell*, 825 F. App'x 243, 260 (6th Cir. 2020) (citing *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation mark omitted))). Only in Defendants' reply brief does Johnston cite the legal standard for spoliation of evidence and substantively argue that summary judgment is an appropriate sanction for Williams's failure to preserve his cell phone.  Arguments raised for the first time in reply briefs are generally deemed waived.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).  In short, Johnston forfeited his spoliation of evidence argument.

Even if Johnston had properly raised this argument, it would fail.  District courts have broad discretion to craft proper sanctions for the spoliation of evidence.  *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2012) ("*Adkins II*").  A party seeking a spoliation sanction because evidence was destroyed must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.  *Id.* at 503-04 (quoting *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010)).

"A district court 'may impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.'"  *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014) (quoting *Automated Sols. Corp. v. Paragon Data Sys.,*

*Inc.*, 756 F.3d 504, 513 (6th Cir. 2014)).  "The severity of sanction issued is determined on a case-by-case basis, depending in part on the spoliating party's level of culpability."  *Id.* (citing *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013)).

An obligation to preserve evidence "'may arise when a party should have known that the evidence may be relevant to future litigation[.]'"  *Beaven*, 622 F.3d at 553 (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).  For purposes of this motion, the Court will assume that Williams had an obligation to preserve the video on his cell phone.

However, the parties dispute whether Williams had the requisite culpable state of mind when he disposed of the cell phone.  The culpable state of mind factor can be satisfied if evidence was destroyed knowingly or negligently.  *Id.* at 554.  However, Rule 37(e) specifically applies to a party's failure to preserve "electronically stored information that should have been preserved in the anticipation or conduct of litigation[.]"  Fed. R. Civ. P. 37(e).  Under that rule, which was amended after *Adkins II* and *Beaven*, the Court may dismiss the action "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation[.]"  Fed. R. Civ. P. 37(e)(2).  In other words, "a showing of negligence or even gross negligence will not do the trick."  *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016).

Here, there is not sufficient evidence establishing a specific intent by Williams to deprive Johnston of the cell phone video in this litigation.  In response to interrogatories, Williams indicated that he would bring the cell phone to his deposition.  (Excerpts of Disc. Resps., ECF No. 48-1, PageID.1096.)  In his amended response to the interrogatories, Williams stated that he was unable to locate the cell phone but would bring it to his deposition if found.  (*Id.*, PageID.1100.)  During his deposition, Williams testified that, the cell phone in question was actually his oldest son's that he was using at the time.  (Williams Dep. 23.)  In 2020, right after the

incident, Williams broke the phone, placed it in a drawer, and purchased a new phone without transferring the data.  (*Id.* at 24.)  Williams believes that his oldest son likely turned the broken phone in to a kiosk to make some money.  (*Id.* at 23.)  This evidence does not suggest that Williams had a specific intent to deprive Johnston of the cell phone video.  His oldest son, who may or may not have known about the litigation, disposed of the cell phone.  At most, Williams has established negligence in the preservation of evidence potentially relevant to this lawsuit, which is insufficient to warrant a sanction under Rule 37(e).

Even if the Court has *inherent* authority to issue a sanction separate and apart from Rule 37(e), the Court does not believe that such extreme sanctions would be appropriate.  Granting summary judgment in Johnston's favor on the unreasonable search claim would not correspond to Williams's own degree of fault.  In sum, Johnston forfeited his spoliation of evidence argument. Even if he had properly raised it, Williams's conduct would not warrant Johnston's requested sanction.

### 2. Merits

"The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures."  *United States v. Sharpe*, 470 U.S. 675, 682 (1985).  "To determine whether a Fourth Amendment violation has occurred, we ask two primary questions: first, whether the alleged government conduct constitutes a search within the meaning of the Fourth Amendment; and second, whether the search was reasonable."  *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019).  The Supreme Court has articulated two distinct approaches to determine what conduct qualifies as a search under the Fourth Amendment.  First,

[u]nder the most prevalent and widely-used search analysis articulated in *Katz v. United States*, 389 U.S. 347 (1967), a search occurs when a government official invades an area in which "a person has a constitutionally protected reasonable expectation of privacy. *Id.* at 360 (Harlan, J., concurring).  Under *Katz*, a search is analyzed in two parts: "first that a person exhibit an actual (subjective) expectation

of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361.

*Id.* Second, and more recently,

the Supreme Court revisited the seldom used "property based" approach to the Fourth Amendment search inquiry in *United States v. Jones*, 565 U.S. 400 (2012). Under *Jones*, when governmental invasions *are* accompanied by physical intrusions, a search occurs when the government: (1) trespasses upon a constitutionally protected area, (2) to obtain information. *Id.* at 404-05.

*Id.* Here, because a physical intrusion occurred, the *Jones* rather than *Katz* approach applies.

Johnston trespassed upon a constitutionally protected area. The Supreme Court in *Riley v. California*, 573 U.S. 373 (2014) recognized that "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]'" *Id.* at 403 (quoting *Boyd v. United States*, 116 U.S. 616 (1886)). Accordingly, the search of a cell phone is unconstitutional absent a warrant. *Id.* at 401 (It "is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest."). Johnston trespassed on this constitutionally protected area when he made physical contact with the cell phone and swiped on the screen. (Johnston Body Camera Video 29:13- 29:25.)

A jury could conclude that Johnston made this physical contact with the cell phone in "an attempt to find something or to obtain information." *Jones*, 565 U.S. at 408. Johnston argues that he was merely attempting to turn off the recording to save battery, rather than look at any personal information on Williams's cell phone. Yet, Johnston does not recall whether he ever turned the phone off to actually preserve the battery. (Johnston Dep. 66.) Moreover, Williams testified that when his phone was returned to him at the Kent County Correctional Facility, the video had been erased. (Williams Dep. 83.) And Johnston testified that he does not know if he deleted the video. (Johnston Dep. 66.) Construing the facts in the light most favorable to Williams, there is a genuine

dispute of material fact as to whether Johnston deleted the video.  If Johnston deleted the video, then he physically accessed the cell phone to find information and erase it.  In that case, Johnston's conduct would constitute a search of Williams's phone.

But the Fourth Amendment analysis does not end there; the Court must next consider whether the search was reasonable.  "'[W]e must begin with the basic rule that searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *Taylor*, 922 F.3d at 334 (quoting *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)).  "The government bears the burden of demonstrating an exception to the warrant requirement."  *Id.* (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).  The Supreme Court in *Riley* held that the search-incident-to-arrest exception to the warrant requirement does *not* apply to cell phones but noted that "other case-specific exceptions may still justify a warrantless search of a particular phone."  *Riley*, 573 U.S. at 401-02.

One such exception "'applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'"  *Id.* at 402 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).  "Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury."  *Id.* (citing *King*, 563 U.S. at 460).

Johnston argues that "there can be a concern for officer safety in allowing a phone to continue to transmit or record during transport to the jail."  (Defs.' Br. in Supp. of Mot. for Summ. J., PageID.128.)  Sergeant Hoornstra testified that this safety concern arises because the phone can be used to livestream or broadcast the location which, in turn, could facilitate escape or send

20

individuals to the scene. (Hoornstra Dep. 15-16.) Johnston thus claims that "putting a cell phone in 'airplane' mode or turning it off is common practice." (Defs.' Br. in Supp. of Mot. for Summ. J., PageID.128.) Maybe so, but it is not clear whether Johnston ever turned the phone off. What is clear is that he swiped on the screen to stop the video recording, and Williams testified that the video had been erased when he received his phone back. Johnston could have held a button on the side of the phone for a few seconds to turn off the phone, but instead, he chose to do more. The exigencies of the situation did not make Johnston's apparent search of Williams's phone reasonable. Thus, there is a genuine dispute of material fact as to whether Johnston searched Williams's phone in violation of the Fourth Amendment.

### 3. Qualified Immunity

Johnston argues that he is nonetheless entitled to qualified immunity because "[t]here is no existing judicial precedent placing the question of attempting to stop a recording or turn off a cell phone before transport to jail beyond debate." (Defs.' Br. in Supp. of Mot. for Summ. J., PageID.128 (internal citation and quotation marks omitted).) The Court disagrees. *Riley* clearly dictates that a warrant is generally required before searching a cell phone, even when a cell phone is seized incident to arrest. *Riley*, 573 U.S. at 401. Construing the facts in Williams's favor, Johnston did not merely turn the cell phone off; rather, he swiped on the screen, stopped the recording, and allegedly deleted the video. Pursuant to *Riley*, Williams has a clearly established right to be free from warrantless searches of his cell phone. Johnston is not entitled to qualified immunity on this claim.

### C. False Arrest

Williams alleges that Johnston falsely arrested him in violation of his Fourth Amendment rights. "'A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.'" *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir.

2020) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)).  "An officer has probable cause to arrest a suspect when the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"  *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  "An objective, not a subjective, standard applies. The question is whether the observable circumstances justify an arrest; the officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'"  *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  "Through it all, this fluid concept looks for a probability that the suspect violated a criminal statute, keeping in mind that probable cause does not establish a high bar."  *Id.* (internal citations and quotation marks omitted).

At the time Johnston initiated Williams's arrest, Williams did not have his driver's license on his person, only a photo on his cell phone, in violation of Mich. Comp. Laws § 257.311, which requires that a driver's license be in "immediate possession at all times when operating a motor vehicle" and that it must be "display[ed] . . . upon demand of any police officer."  Johnston then learned that Williams's license was also suspended.  Johnston ultimately ticketed Williams for two misdemeanors: (1) driving with a suspended license in violation of Mich. Comp. Laws § 257.904 and (2) assaulting, battering, or resisting a police officer in violation of Grand Rapids City Ordinance § 9.135.  (Ticket, ECF 42-4, PageID.798.)  Williams pled guilty to the latter and was not ultimately charged with the former.  (*See* Reg. of Actions for 61st D. Ct., ECF No. 42-4, PageID.800.)  Williams argues that Johnston lacked probable cause to arrest him for assaulting, battering, or resisting a police officer.  Regardless, Johnston had probable cause to arrest Williams

for not having a license on his person and for driving with a suspended license.  Thus, Williams's

false arrest claim fails, and Johnston is entitled to summary judgment.

### D. Municipal Liability

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held

that municipalities could be liable under § 1983 for constitutional violations, but they "cannot be

liable for the constitutional torts of [their] employees."  *Powers v. Hamilton Cnty. Pub. Def.

Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).  Meaning, "[a] municipality may not be held liable

under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a

tortfeasor.'"  *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436

U.S. at 691) (emphasis in original)).

To succeed on a *Monell* claim against the City, Williams must demonstrate that "'through

its deliberate conduct, the municipality was the moving force behind the injury alleged.'"  *Wright

v. City of Euclid*, 962 F.3d 852, 879-80 (6th Cir. 2020) (quoting *Alman v. Reed*, 703 F.3d 887, 903

(6th Cir. 2013)).  "A plaintiff does this by showing that the municipality had a 'policy or custom'

that caused the violation of his rights."  *Id.* at 880 (quoting *Monell*, 436 U.S. at 694).  There are

four ways Williams can show an illegal policy or custom: "'(1) the existence of an illegal official

policy or legislative enactment; (2) that an official with final decision making authority ratified

illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the

existence of a custom of tolerance or acquiescence of federal rights violations.'"  *Jackson v. City

of Cleveland*, 925 F. 3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478

(6th Cir. 2013)).  Williams relies on the third theory.

"Inadequate training can be the basis for a *Monell* claim, but '[a] municipality's culpability

for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'"  *Morgan

by Next Friend Morgan v. Wayne Cnty.*, 33 F.4th 320, 329 (6th Cir. 2022) (quoting *Connick v.

*Thompson*, 563 U.S. 51, 61 (2011)).  "[T]o show that a municipality is liable for a failure to train its employees, a plaintiff 'must establish that: (1) the City's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).  "[A] plaintiff can show deliberate indifference based on 'single-incident liability' if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it."  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (citing *Connick*, 563 U.S. at 63).

Williams argues that the City inadequately trained its officers on uses of force, which presents an obvious potential for constitutional violations.  Williams relies on various officers' deposition testimonies to support this conclusion.  Johnston testified that he attends a use of force training approximately once or twice a year and emphasized that uses of force are judged based on the totality of the circumstances.  (Johnston Dep. 17-18.)  When asked to define passive resistance, Johnston indicated that he would have to refer to the GRPD manual.  (*Id.* at 20.)  Officer Wilson testified that he attends two use of force trainings per year but could not specifically recall when the last training was that discussed the topic of active or passive resistance.  (Wilson Dep. 7-8, ECF No. 42-4.)  However, Williams makes no mention of Sergeant Hoornstra's testimony in which he answered hypotheticals as to what qualifies as active or passive resistance and provided definitions for both terms.  (Hoornstra Dep. 12- 13, 17-21.)

In *Ouza*, the Sixth Circuit found that the failure to provide any training on probable cause determinations or uses of force to be constitutionally inadequate.  *Ouza*, 969 F.3d at 289.  In that case, the defendant officer "had not had *any* training on excessive force or probable cause

determinations in the past fourteen years leading up to [the plaintiff's] arrest." *Id.* at 288 (emphasis added).  Unlike the officer in *Ouza*, GRPD officers receive use of force trainings annually or semi-annually.  That one officer could not verbatim recite the definition of active or passive force while another officer could does not suggest that the trainings are woefully inadequate, such that they amount to no training at all.  Williams has not put forth sufficient evidence to create a genuine dispute of material fact on his failure-to-train claim.  The City is entitled to summary judgment on this claim.

### E. State Law Claims

Williams brings an assault and battery claim against Johnston and Seide; a false arrest and false imprisonment claim against Johnston; and a gross negligence claim against Johnston and Seide.

#### 1. Intentional Torts

Johnston and Seide argue they are entitled to governmental immunity on the intentional tort claims.  Courts apply the test set forth in *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (1984) to determine whether governmental immunity applies to a particular intentional tort.  *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008).  Under the *Ross* test, a defendant may establish that he is entitled to governmental immunity by showing: (1) "[t]he acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within he scope of his authority," (2) "the acts were undertaken in good faith, or were not undertaken with malice," and (3) "the acts were discretionary, as opposed to ministerial."  *Id.* Johnston and Seide bear the burden of establishing that they are entitled to immunity from Williams's intentional tort claims.  *Id.* at 227-28.

### (a) Assault and Battery

Williams alleges that Johnston and Seide are liable for assault and battery for their uses of force. "'Under Michigan law an assault is an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.'" *Beltz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (quoting *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009)). "A battery is defined as 'an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.'" *Id.* (quoting *Grawey*, 567 F.3d at 315).

Williams does not dispute that Johnston and Seide satisfy the first and third factors of the *Ross* test. Rather, he disputes whether they were acting in good faith. "Unlike qualified immunity under federal law, which uses an objective standard, '[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.' Therefore, '[t]he proponent of individual immunity must establish that he acted without malice.'" *Id.* (quoting *Odom*, 760 N.W.2d at 225, 229). Johnston and Seide acted without malice.

With respect to the straight arm-bar takedown, Johnston testified that Williams dropped his weight in a deliberate attempt to re-enter the vehicle. (Johnston Dep. 56-57.) Seide, who stood near Johnston watching, testified that when Williams bent down towards his vehicle, he believes Williams "could [have] got in the car, hurt [him] or something or went for a weapon or anything could have happened had he got back inside the vehicle." (Seide Dep. 38.) Although Williams testified that he unintentionally fell into the vehicle, the good-faith element of the *Ross* test is subjective, not objective, in nature. Johnston believed that Williams was attempting to evade arrest and enter the vehicle, and Seide expressed the same concern. A jury could not conclude that Johnston acted with malicious intent in executing the straight arm-bar takedown.

26

Moreover, Johnston continued to believe that Williams posed a flight risk once on the ground.  Johnston testified that because Williams "had already attempted to resist . . . he may have tried to flee off the ground." (Johnston Dep. 61.)  Seide likewise testified that placing a knee on a suspect's back is "a tactic used to make sure they don't try to get back up so that you're already there." (Seide Dep. 16.)  Johnston's dash camera video depicts both Johnston and Seide placing a knee on Williams's back for approximately ten seconds while securing the handcuffs.  (Johnston Dash Camera Video 5:28-5:39.)  Once the handcuffs were secured, Seide immediately stepped away and Johnston kept his knee on Williams's back for "possibly a couple seconds." (*Id.* at 5:40-5:45; Williams Dep. 88.)  Johnston and Seide subjectively believed that placing a knee on Williams's back for less than a minute during handcuffing would eliminate any risk of flight.  Johnston and Seide did not act with malicious intent.  Both officers are entitled to governmental immunity on the assault and battery claim, and summary judgment will be granted in their favor on this claim.

### (b) False Arrest and False Imprisonment

Williams next alleges that Johnston is liable under Michigan law for false arrest and false imprisonment.  To prevail on a false arrest claim, Williams must demonstrate that Johnston "'participated in an illegal and unjustified arrest, and that [Johnston] lacked probable cause to do so.'" *Beltz*, 641 F.3d at 758 (quoting *Walsh v. Taylor*, 689 N.W.2d 506, 513 (Mich. Ct. App. 2004)).  "'The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement.'" *Id.* (quoting *Walsh*, 689 N.W.2d at 514).  "False imprisonment also requires that '[t]he restraint . . . occurred without probable cause to support it.'" *Id.* (quoting *Walsh*, 689 N.W.2d at 514).  As explained in relation to the federal false arrest claim, Johnston had probable cause to believe that Williams did not have his license on his person and to

27

subsequently ticket him for driving with a suspended license in violation of Mich. Comp. Laws § 257.904.

Even if Johnston did not have probable cause, he would be entitled to governmental immunity.  There is no evidence in the record to suggest that Johnston acted with malice when he took Williams into custody.  Rather, Johnston stopped Williams for not using a turn signal, he asked Williams for his license, and Williams could not produce it.  Johnston initiated the arrest because it is a misdemeanor under Mich. Comp. Laws § 257.311 to drive without a license or to fail to display it to an officer.  Johnston then learned that William's license had been suspended, so he proceeded to ticket Williams.  There is no reason to believe Johnston acted in bad faith under Michigan's subjective standard.

In sum, because Johnston had probable cause, he is entitled to summary judgment on this claim.  Even if he did not have probable cause, he would be entitled to governmental immunity.

### 2. Gross Negligence

Under Michigan law, government employees are not entitled to immunity from tort liability if their "conduct amounts to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c).  Johnston and Seide seek summary judgment on Williams's claim of gross negligence.

"Michigan courts have repeatedly 'rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 642 (6th Cir. 2013) (quoting *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004)).  In *VanVorous*, the plaintiff alleged that officers were grossly negligent in shooting her husband.  687 N.W.2d at 136-37.  The plaintiff argued that the officers "breached the duty of care they owed to Mr. VanVorous by utilizing excessive force to subdue or control Mr. VanVorous and failing to follow proper police procedure in apprehending him."  *Id.* at 483.  The

28

Michigan Court of Appeals rejected the plaintiff's argument and found that "plaintiff's claim of gross negligence is fully premised on her claim of excessive force."  *Id.*

Williams attempts to avoid the *VanVorous* principle by basing his gross negligence claim on Johnston and Seide's breach of "a duty to perform their employment activities so as not to endanger or cause harm to Plaintiff."  (Compl. ¶ 61.)  Williams further alleges that the officers "breached [this] duty with deliberate indifference and gross negligence and without regard to Plaintiff's rights and welfare, which caused serious injuries and damages to Plaintiff."  (*Id.* ¶ 62.)

In *Richards v. City of Jackson*, 788 F. App'x 324 (6th Cir. 2019), the plaintiffs' complaint similarly alleged that the police officer "had a duty to perform his employment activities so as not to endanger or cause harm to Plaintiffs," and he "breached his duties with deliberate indifference and gross negligence and without regard to Plaintiffs' rights and welfare, which caused serious injuries and damages to Plaintiffs."  *Id.* at 336 (internal citation and quotation marks omitted).  The Sixth Circuit noted that it "has sustained gross-negligence claims premised on allegations that officers were 'grossly negligent in failing to follow certain procedures and statutory obligations' or where the plaintiff can otherwise 'show that the defendant owed him a duty of care.'"  *Id.* at 336-37 (quoting *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 701 (6th Cir. 2018)); *see also Jackson v. Lubelan*, 657 F. App'x 497, 502-03 (6th Cir. 2018); *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010).  The Sixth Circuit ultimately concluded that "the plaintiffs' allegation of gross negligence [] is 'based on the same incident' as the intentional torts [the officer] describes, but the plaintiffs have 'adequately alleged an alternative basis for the claim.'"  *Id.* at 337 (quoting *Bell*, 739 F. Supp. 2d at 1015).  Thus, the allegation that the officer breached his duty to perform his employment activities so as not to endanger or harm the plaintiffs was "sufficiently distinct from the separately-pleaded intentional torts."  *Id.*

29

More recently, however, the Sixth Circuit in *Reynolds v. Addis*, No. 21-1454, 2022 WL 1073832 (6th Cir. Apr. 11, 2022) found that "'gross negligence is not an independent cause of action when the underlying claim is an intentional shooting of a suspect by an officer.'"  *Id.* at *6 (quoting *Presnall v. Huey*, 657 F. App'x 508, 513 (6th Cir. 2013)).  Judge Clay in dissent pointed to *Richards*, which also involved an intentional shooting, and argued that because "the record raises genuine and material disputes of fact regarding the nature of [the defendant's] conduct when he shot and killed [the plaintiff]," the plaintiff alleged an alternative basis for a gross negligence claim such that the defendant was not entitled to summary judgment.  *Id.* at *11 (Clay, J., dissenting).

The Court ultimately need not address whether Williams's gross negligence claim is fully premised on his claim of excessive force because Williams fails to demonstrate that Johnston and Seide's conduct amounts to gross negligence.  Before proceeding to the merits of the claim, however, the Court notes that allowing a plaintiff's claim to proceed under these circumstances— based solely on a duty not to cause injury—potentially allows gross negligence claims to proceed in every case involving excessive force.  This would undermine, if not entirely eradicate, the principle articulated in *VanVorous*.

Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  Mich. Comp. Laws § 691.1407(8)(a); *see also Bellinger by Bellinger v. Kram*, 904 N.W.2d 870, 873 (Mich. Ct. App. 2017).  "It has been characterized as a willful disregard of safety measures and a singular disregard for substantial risks."  *Oliver v. Smith*, 810 N.W.2d 57, 62 (Mich. Ct. App. 2010) (internal citation omitted).  "If reasonable jurors could honestly reach different conclusions whether conduct constitutes gross negligence, the issue

is a factual question for the jury.  However, if reasonable minds could not differ, the issue may be determined by a motion for summary disposition."  *Id.* (internal citation omitted).

Johnston did not demonstrate a substantial lack of concern for Williams's well-being when employing the straight arm-bar takedown.  Johnston testified that he used a trained technique and placed his knee under Williams to break his fall.  (Johnston Dep. 58, 59.)  Williams testified that he had a bruise on the back of his head from when his head hit the ground during the takedown. (Williams Dep. 56-57.)  However, the dash camera video indicates otherwise.  Williams's head does not appear to have made contact with the ground on his way down.  (Johnston Dash Camera Video 5:26-5:29.)  Moreover, because Williams fell forward onto his stomach, it is difficult to see how he could have bruised the *back* of his head.  Williams's brief does not otherwise point to any procedures or precautionary measures that Johnston failed to adhere to during the takedown.

Johnston and Seide's placement of their knees during and immediately after handcuffing likewise was not grossly negligent.  Johnston and Seide placed their knees on Williams's back for approximately ten seconds while securing the handcuffs, and Johnston continued to hold his knee on Williams's back for "possibly a couple seconds" after the handcuffs were secured.  (Williams Dep. 88.)  Such conduct does not demonstrate a disregard for whether an injury will result.  And Williams's brief again does not point to any procedures or precautionary measures that Johnston and Seide disregarded.  Moreover, the Court cannot discern whether Williams even suffered any injury from less than a minute of pressure on his back.  In short, there is no genuine dispute of material fact as to whether Johnston and Seide's conduct amounts to gross negligence.  Both officers are entitled to summary judgment on this claim.

### IV. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part Defendants' motion for summary judgment or, in the alternative, for judgment on the pleadings.  The Court

will grant summary judgment to Johnston on the federal law claims of excessive force and false

arrest as well as the state law claims of assault and battery, false arrest and false imprisonment,

and gross negligence. The Court will likewise grant summary judgment to Seide on the federal

law claim of excessive force and the state law claims of assault and battery and gross negligence.

It will also grant summary judgment to the City on the municipal liability claim.  However, it will

deny summary judgment and qualified immunity to Johnston on the unlawful search and seizure

claim.  An order will enter consistent with this Opinion.


Dated: May 9, 2023                               /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 CHIEF UNITED STATES DISTRICT JUDGE